UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

—   —   —

UNITED STATES OF AMERICA,

　　　　　Plaintiff,

　vs.                                  Case No. 14-20655
                                              15-20201
DEONTA MATTHEWS,

                                    Hon. Marianne O. Battani
          Defendant.
_____/

SENTENCE

BEFORE THE HONORABLE MARIANNE O. BATTANI
United States District Judge
Theodore Levin United States Courthouse
231 West Lafayette Boulevard
Detroit, Michigan
Thursday, September 21, 2017

APPEARANCES:

For the Plaintiff:   A. TARE WIGOD

For the Defendant:   BEN M. GONEK

                     BARTON W. MORRIS, JR.

*To obtain a copy of this official transcript, contact:*
*Robert L. Smith, Official Court Reporter*
*(313) 964-3303 • rob_smith@mied.uscourts.gov*

TABLE OF CONTENTS

Page

Sentence on Case No. 15-20201.....................30

Sentence on Case No. 14-20655.....................42

 1   Detroit, Michigan

 2   Thursday, September 21, 2017

 3   at about 2:20 p.m.

 4                        —   —   —

 5            (Court, Counsel and Defendant present.)

 6            THE CASE MANAGER:  Please rise.

 7            The United States District Court for the Eastern

 8   District of Michigan is now in session, the Honorable

 9   Marianne O. Battani presiding.

10            You may be seated.

11            The Court calls Case No. 15-cr-20201 and

12   14-cr-20655, United States of America vs. Deonta Matthews.

13            THE COURT:  Good afternoon.  May I have your

14   appearances, please?

15            MR. WIGOD:  Good afternoon, Your Honor.  Tare Wigod

16   on behalf of the government.

17            MR. MORRIS:  Your Honor, my name is Barton Morris.

18   I'm appearing on behalf of Deonta Matthews specifically with

19   respect to 15-cr-20201.

20            THE COURT:  Okay.

21            MR. GONEK:  Good afternoon, Your Honor.  My name is

22   Ben Gonek.  I'm appearing on behalf of Mr. Matthews for the

23   2014 case.

24            THE COURT:  All right.  Mr. Matthews, would you

25   please come up to the podium with your attorneys.

1          All right.  This is -- we will start with 15-20201,

2    which is the racketeering and receipt of a firearm case.  So,

3    Mr. Gonek, you may stay up here or you may sit down if you

4    wish.

5          MR. GONEK:  Thank you, Your Honor.

6          THE COURT:  All right.  Mr. Matthews, did you

7    review the presentence report on this matter?

8          THE DEFENDANT:  Yes.

9          THE COURT:  Okay.  And I did receive an objection.

10   Mr. Morris, the objection was regarding paragraphs 18 and 19.

11   Do you want to address those?

12         MR. MORRIS:  Okay.  Your Honor, as the Court is

13   likely aware, I did substitute for counsel for the sentencing

14   here.  I did not file this objection, and I presumed it was

15   filed, as you said, in paragraphs 18 and 19 contesting

16   whether this Court should score a sentence enhancement for a

17   death as relevant conduct.  It is at this time that I would

18   on behalf of my client withdraw that objection.

19         THE COURT:  All right.  Then we don't have to deal

20   with that.  There's no objections to withdrawing it, I'm

21   assuming?

22         MR. WIGOD:  Correct.  I don't know of any other

23   objections if that one is withdrawn, Your Honor.

24         THE COURT:  I think that was the only objection

25   that I had.  Let me ask you, Mr. Morris, if you had any other

1   objections.  I don't have any noted but --

2           MR. MORRIS:  No.

3           THE COURT:  No.  Okay.  And I have defendant's

4   sentencing memo, which was submitted by his prior attorney,

5   and the government's sentencing binder actually was submitted

6   I think the last time we were here for sentencing, and the

7   Court has reviewed those things.

8           So, Mr. Matthews, do you have anything that you

9   wish to say before the Court sentences you?

10          THE DEFENDANT:  Yes.  I got a letter I wanted

11  to say to the Court.

12          THE COURT:  I'm sorry.  Could you please speak into

13  the microphone so we can hear you?

14          THE DEFENDANT:  I say I got a letter that I would

15  like to read to you that I wrote.

16          THE COURT:  Okay.  Yes, and I did receive letters

17  from you, which the Court has read, but you may go ahead with

18  your letter.

19          THE DEFENDANT:  Thanks.  First and foremost, I'm

20  willing to accept responsibility for my actions, and over

21  these last two and a half years I learned more than I've ever

22  learned in my entire life and I'm not the same person I was

23  when I first stood in front of you.  I'm not the same person

24  when I first stood in front of you at 19.  I'm 22 now and I

25  have grown rapidly mentally, physically and spiritually.

1        I didn't have the male support so I just followed

2   the trends and got sucked into the everyday life in my

3   neighborhood.  It seemed normal.  Now I realize I had my

4   blinders on and not my wide screen to see the bigger pictures

5   in life.

6        THE COURT:  Could you speak a little slower and a

7   little louder so the reporter can get it down, please?  Thank

8   you.

9        THE DEFENDANT:  You want me to start over?

10       THE COURT:  No, no, we have it up until that point.

11       THE DEFENDANT:  All right.

12       MR. MORRIS:  You had your blinders on and not your

13  wide screen.

14       THE DEFENDANT:  Oh, I had my blinders on and not my

15  wide screen to see the bigger pictures and the important

16  values of life.

17       Since being incarcerated, I have come to a point

18  where I love to read, and knowledge is power, and I am

19  behind.  I never knew of all of the great books that had all

20  the answers that I was looking for originally, and that

21  easily took the spot of the male role model.  I never heard

22  of these great books.  When the * dashers used to say read a

23  lot, I just started borrowing books from school.  I didn't

24  see how Romeo and Juliet or the Frog who kissed the princess

25  could help me, and I'm not the person that these people try

1    to make me out to be, not even close.

2          I am not perfect, but that's not me.  And no matter

3    what happens today, I'm still going to continue to better

4    myself every day and stay in tune with my higher self and

5    stand on my two feet like a man and grow from this situation.

6    And I want the courts to know I'm remorseful for my actions.

7          Thank you.

8          THE COURT:  Counsel?

9          MR. MORRIS:  Thank you, Your Honor.

10         If you don't mind, I would like to read something

11   from my cell phone, the reason being yesterday I received a

12   letter, an additional letter from a pastor at a church that

13   my client attended.  I sent it to the prosecutor already.  I

14   just wanted to read it; it is very brief.

15         THE COURT:  All right.

16         MR. MORRIS:  This is from God Praises Baptist

17   Church on James Couzens, signed by or typed by Pastor

18   Fannie Clay.

19         Deonta Matthews is a member of God Praises Baptist

20   Church.  This young man is very respectable to his elders,

21   family oriented, always willing to give a helping hand.  He

22   will give the clothes off his back to the less fortunate.

23         Deonta speaks positively to the younger youth and

24   peers.

25         I attended this young man's graduation from Redford

1    High School and then received the good news that he was

2    attending Schoolcraft College.  Deonta has been on church --

3    excuse me.

4         Deonta has been on church events in and out of

5    state to support other church members in achieving their

6    dreams and goals.  He has volunteered at community activities

7    like neighborhood cleanups, feeding the homeless, also

8    participated in donations to outside of the state for

9    emergency relief programs.

10        I felt obviously that was important for the Court

11   to understand.  And I want to begin with the fact that I am

12   new to this case, and I'm standing before this Court for the

13   first time representing Mr. Matthews, but I want the Court to

14   know I have spent a significant amount of time familiarizing

15   myself with the discovery and the facts of this case and the

16   reasons why we are here.

17        But I think more importantly, as I had began to go

18   through all of this voluminous information, it became more

19   important that I do my best to try to get to know

20   Mr. Matthews and his family and how his family feels about

21   him and how he feels about his family because I think that

22   that's equally as important and probably what I can do most

23   to help this Court decide what an appropriate sentence should

24   be.  And in doing so, I've learned a number of things that I

25   think are important that I'm about to -- I'm going to advise

| | |
|---|---|
| 1 | you of. |
| 2 | First, in just reading this letter, it dawned on me |
| 3 | the significance of the fact that this pastor attended his |
| 4 | high school graduation from Redford High School.  I would |
| 5 | imagine -- I'm pretty sure most, if not all, of the |
| 6 | codefendants in this case did not graduate from high school |
| 7 | and probably didn't even get a GED.  What that means to me |
| 8 | and I think that it explains at a time when he was -- and |
| 9 | this happened in 2014, he graduated in 2014, when he was, |
| 10 | what, 18 years old? |
| 11 | THE DEFENDANT:  Uh-huh, yes. |
| 12 | MR. MORRIS:  He intended and wanted to graduate |
| 13 | from high school.  That was a goal of his.  He purposefully |
| 14 | stayed in school obviously knowing that he didn't have to and |
| 15 | realizing that that wasn't -- but understanding that he |
| 16 | wanted to finish school.  And not only that, after graduating |
| 17 | from high school, not a GED, he then enrolled in college, |
| 18 | Schoolcraft College.  This is before being indicted on this |
| 19 | particular offense.  This was a time when he wanted to |
| 20 | improve himself and get out of the street life that brought |
| 21 | him or brings him before the Court today. |
| 22 | He went to school for a full two months in January |
| 23 | and in February of 2015.  My client tells me that during that |
| 24 | period of time he really enjoyed it.  It demonstrated and |
| 25 | showed him really for the first time in his life that this |

1  was a life that he could look forward to and not be looking

2  behind his back all the time and worrying about whether

3  somebody was going to hurt him or kill him and that he could

4  improve his life.

5           He just told you about how he loves reading books

6  now, and this is something that -- this is basically a

7  demonstration of the fact that the man that stands before you

8  today and even the man that stood -- that was going to school

9  at that time is not the same man that committed these

10  offenses, the offenses for which he stands before the Court

11  when he was just 16 or 17 years old.

12          He's been in custody now for two and a half years.

13  He's 22 years old now.  16 and 17 years old is when these

14  offenses occurred maybe -- yeah, 16 and 17 years old.  Now,

15  I -- I don't think it's a stretch to say that at that age,

16  under the circumstances in which he was living, it doesn't

17  provide an excuse for anything, but I think everybody would

18  agree that that's a significant age of immaturity and of

19  uneducation.

20          And growing up where he did under the circumstances

21  that he did caused things to happen as they did, but things

22  changed after which where he began to understand that he

23  could be a better person and was really looking forward to

24  the opportunity of doing so and even wanting to leave and get

25  out of Detroit.  That's part of the reason why he was in

1   Redford, because he wanted to get out of Detroit and out of

2   the bad influences that was -- that were there.

3           I want to remind the Court that he did plead guilty

4   to two counts.  The first count, that conspiracy charge for

5   racketeering, those are offenses that did occur when he was

6   young, and that's a 20-year maximum sentence.  And I think it

7   would be appropriate for the Court to think about these

8   sentences in a bifurcated manner because they did represent

9   two distinct periods in his life and two very different

10  periods of his life.

11          The RICO offense being a maximum of 20 years, and

12  then there is the firearm offense at a time when he was right

13  before -- after he had graduated from high school, which

14  again I just find it to be very remarkable, and then right

15  before he enrolled in college, that was a different person,

16  somebody that was literally on his way out of that street

17  life and presumably and hopefully into something that was

18  going to be more positive.  Unfortunately he --

19          THE COURT:  When was that RICO?

20          MR. MORRIS:  That started when he was 16 years old.

21          THE COURT:  Okay.  And the gun charge, the second

22  charge?

23          MR. MORRIS:  The second charge that he pled guilty

24  to occurred on February 22nd, 2015.

25          THE COURT:  2015.

1      MR. MORRIS:  He was in school at that time, and, of

2  course, he's still obviously carrying --

3      THE COURT:  He graduated in '14 so --

4      MR. MORRIS:  Right.  He graduated in 2014.  He

5  started school in January 2015.  There's a lot of firearms

6  charges.  My client believes that this particular one that he

7  had pled guilty to may have happened in July.  I talked to

8  the prosecutor about it --

9      (An off-the-record discussion between Defense

10     counsel and Defendant was held at 2:35 p.m.)

11     MR. MORRIS:  I'm talking about the offense that we

12 are standing here before you today, Count 4.  Count 4 --

13     THE COURT:  Count 4.

14     MR. MORRIS:  Count 4 I believe occurred between

15 February 25, 2015 -- or February 22nd to February 25th, 2015

16 based upon some evidence of a video recording, is that not

17 right?

18     MR. WIGOD:  That's correct.

19     MR. MORRIS:  So the reason I say that is because at

20 the time that it occurred he was a different person and

21 likely and hopefully presumably on his way out of the street

22 life that had caused the offenses for which substantiate

23 Count 1.

24     THE COURT:  So he was a different person.  You have

25 to fill me in a little because I'm getting a --

1          MR. MORRIS:  Yeah.

2          THE COURT:  I don't know where this comes from.  He

3    had involvement from when he was kid in 2012 was the murder.

4          MR. MORRIS:  Right, 2012, which is a -- far

5    removed, especially for a young man, in 2015.

6          THE COURT:  Right, right, but the robberies were in

7    April of 2014, and he was graduating I assume in May or June

8    of 2014.  Would that be right?

9          MR. MORRIS:  I believe so.

10          THE COURT:  So what happened between that June

11   period in 2014 and when you say he changed in -- in February

12   of 2015?

13          MR. MORRIS:  He enrolled in school and that was the

14   basis upon which I was making this argument that he had a

15   desire to continue to go to school or continue to school to

16   better himself and not just do what he was doing because I

17   think those two things are contradictory.  Why would somebody

18   continue to live this life in the streets and then also go to

19   Schoolcraft College to learn to be a chef?  And I believe

20   that is a recognition or at least some evidence of the fact

21   that he was changing, growing up, maturing, and is becoming a

22   different person.  That's my argument.

23          THE COURT:  Okay.

24          MR. MORRIS:  And that is why I recommend to the

25   Court that he should not be receiving the -- the people --

1    the government in this case are asking for the actual -- the

2    absolute statutory maximum, 20 years and 15 years, and the

3    offenses for which encompass the racketeering charge is

4    20 years.  I would ask the Court to consider giving him

5    20 years for that and an additional five years for the gun

6    charge, and that being I think consistent with this Court's

7    obligations.

8            The 18 350 -- the 3553 factors, as I review them

9    and how this Court should see them in (a)(1), the nature and

10   circumstances of the offense, he's receiving a significant

11   sentence obviously because of the offense, particularly

12   Count 1.  It also reflects the seriousness of the offense and

13   promotes respect of the law as in (a)(2)(A).  It also affords

14   a significant deterrence to criminal conduct.  He's going to

15   be protected from society with that type of sentence.  I had

16   hoped during that --

17           THE COURT:  Or society is going to be protected

18   from him.

19           MR. MORRIS:  Yes, that's -- that's what I meant.

20   Sorry.  He will -- society will be protected from him.

21           In short, what I'm saying is that sentence of

22   20 years satisfies all of these things.  A sentence of

23   35 years far exceeds what is necessary in order to -- in

24   order to establish what the Court needs to do under these

25   factors.

1    I have also wanted to note, there are about 17 or

2    18 individuals from the defendant's family here today,

3    including his mother and his grandmother and his sister.

4    That demonstrates a lot of family support.

5    One thing I thought was significant, looking even

6    at the defendant's tattoos, he has his mother's name on his

7    body and his sister's name on his body.  He loves his family.

8    I wish the Court could have seen his face when he turned

9    around and looked at his family coming into court today, it's

10   the biggest smile I've seen since I've known him, and to me

11   it just demonstrates that this is no longer that individual

12   that committed these offenses.  He's -- like I said, he's

13   been in custody for two and a half years.  This Court is

14   going to -- has -- is going to give him a significant

15   sentence.  We just ask that you not make it more than what is

16   necessary.

17            THE COURT:  Okay.

18            MR. MORRIS:  Thank you.

19            THE COURT:  Thank you.

20            Mr. Wigod?

21            MR. MORRIS:  My client would like to say one more

22   thing.

23            THE COURT:  Sure.

24            THE DEFENDANT:  I just want to add to the fact -- I

25   just want to add on about my family, like my mom and my

```
 1   sister and my grandmother, aunty, like a lot of stuff that I
 2   was into, it was secret, it was stuff that I was doing.  It
 3   wasn't nothing that they knew about or was aware of because
 4   I'm pretty sure they would have tried to pull me into
 5   something else.  It is something that they wasn't aware of,
 6   it was things that I was doing.
 7            THE COURT:  They didn't know about your gang
 8   activities?
 9            THE DEFENDANT:  No, they didn't know.  It was stuff
10   that I was hiding and keeping to myself.  They didn't know
11   about it as growing up.  They wouldn't have -- they wouldn't
12   have agreed to it at all.  That's all I just wanted to add to
13   the record and let you know that.
14            THE COURT:  So I take it you had their support
15   while you were engaged in these gang activities even though
16   they didn't know about the gang activities?
17            THE DEFENDANT:  Right.
18            THE COURT:  That you had support from them?
19            THE DEFENDANT:  Right, from my mom, grandma and
20   aunty, yeah.
21            THE COURT:  And what do you believe is different
22   now because they supported you all along, so what's different
23   now that would make you change because you had their support
24   before?
25            THE DEFENDANT:  It's just -- a lot of stuff that I
```

```
 1   see is not important.  I see a lot of stuff that's not
 2   important.  It wasn't necessarily that -- they supported me,
 3   but it wasn't necessarily that they knew all of my problems
 4   or they knew what I needed or could give to me without all I
 5   needed what I was looking for.  Like I grew up around all
 6   female, women in the house, so I didn't really 100 percent
 7   like listen or respect what they say in so many words because
 8   I feel like they not men so they don't really understand
 9   where I'm coming from or certain situations that happen
10   outside of the house.  I feel like I needed a male, so I just
11   figured like I go about it myself and learn as I go.  But I
12   realized that they here and they have the right answers and I
13   could have went to them for the answers.  A lot of stuff they
14   didn't know about, you know.  So, it is different now, I
15   understand it now.  I bumped my head and I learned, I learned
16   a lot, so --
17             THE COURT:  Okay.  So as I look at your background,
18   and we have to hear from the government yet, but I just want
19   to say, because I have a question, as I look at your
20   background, you know, you appear to be -- in my old days we
21   would say you were a punk, okay, that's just what you were,
22   you were a smarty, you thought you knew better than
23   everybody, you thought you were in control of everybody and
24   everybody's life.  But my question is to you now, you say
25   you've learned because you have matured, what can you say to
```

1  young people, how can we stop young 16, 17, 18-year-old

2  mostly boys, how can we prevent them from looking forward to

3  years in prison like you are?

4        THE DEFENDANT:  I teach them about this, I teach

5  them about the feds, I teach them about the federal system

6  and how much time they giving out.  It have to be somebody

7  that is coming out of there around the age that they can

8  listen to because when I was in high school and they used to

9  bring up people, fire fighters and people that's 40, 50, we

10  weren't trying to listen to them.  It would have to be

11  somebody around their age that has been through a lot of

12  stuff that they can listen to that can kind of relate to

13  them.  So I teach them about the federal system, mandatory

14  minimums, and I teach them about that, that will stop them

15  because --

16        THE COURT:  Well, that's interesting.  So you are

17  saying, and that's an idea, that we need people like you who

18  have been through the system, who have been of the worst

19  kind, to go while you are young into schools and say this is

20  what happens to you?

21        THE DEFENDANT:  Exactly, examples.

22        THE COURT:  Somebody else had an answer back here.

23  I would like to hear from him.  Are you the father?

24        MR. HARPER:  Yes, ma'am.

25        THE COURT:  Could you come up here please.  Just

1    get on the other side of counsel.

2            MR. HARPER:  Can I hug my son?

3            THE COURT:  Your name, sir?

4            MR. HARPER:  Rydell Harper.

5        The father plays a big role in the black male

6    coming up in society today, and when he's not in the

7    household, we tend to run wild.  It is a perpetuating

8    situation, and it's not going to only to take the black

9    folks' help, it's going to take Caucasians also to bind in,

10   to stop this destruction of the black home.  We are not

11   blaming anyone.  It starts in the home, and without a father

12   in the home, it's hard for a young male to be contained or to

13   follow some type of a structure.

14           THE COURT:  So is the answer for the fathers to be

15   in the home?

16           MR. HARPER:  Around the child more, ma'am, a male

17   child especially.  It's not a big secret that that's not a

18   high percentage in the black communities across America.

19           THE COURT:  Okay.  I mean, I think that's

20   absolutely right on, and I accept what you are saying.  I

21   wish we could do something a little better to take care of

22   that because we see these young people coming in all the

23   time, and what do you do when you look forward to 20, 30,

24   40 years in prison?  I mean, that's ridiculous.

25           MR. HARPER:  Yes, ma'am.

1        THE COURT:  Okay.  Thank you.

2        MR. HARPER:  Yes, ma'am.

3        THE COURT:  Government?

4        MR. HARPER:  Can I hug my son, ma'am?

5        THE COURT:  No, I'm sorry, I can't let you do that.

6        MR. HARPER:  Yes, ma'am.

7        MR. MORRIS:  Shall we stand?

8        THE COURT:  Yes, just stand there.  Mr. Wigod.

9        MR. WIGOD:  Thank you, Your Honor.

10       Your Honor, there's always a dichotomy between the

11  defendant who stands before you at sentencing and the

12  defendant who was before and how he got to be before you.

13       I have investigated this case for several years.

14  I'm very familiar with Mr. Matthews.  The only thing that I

15  think that he's learned during this time is how to properly

16  address the Court because when a person evaluates the

17  totality of the circumstances, it's terrifying.

18       When he was ultimately detained on these cases, he

19  was 16 years old; I'm sorry, he was 19 years old.  And when

20  you look at between what he did when he was 19 and 16, he

21  created havoc, menace and mayhem in his community, and what

22  he did in just a short few years is staggering.  Had he gone

23  on and continued out in the community, it would have been

24  devastating.

25       And these are just some of the short -- things that

1    he did in the short few years that he was out:  He was a

2    leader of a criminal street gang, his street name was CEO

3    Tay.  You are well aware of the case and what these

4    individuals did, but they were responsible for murder,

5    carjackings, robberies, shootings.  These are things that he

6    advocated and condoned.  He was the leader of these

7    individuals.  So it is not as if you can isolate his

8    behavior.  To a certain degree, he's responsible for the

9    others that he led.

10         He had a direct impact on the other individuals --

11   the younger individuals in the gang.  There's mind-blowing

12   statements by him on Facebook about what to do.  Some younger

13   individuals asked Mr. Matthews how do I get into the gang,

14   and his response is kill one of our enemies.

15         There's photographs all over social media with him

16   in possession of firearms.  He's glorifying these deadly

17   weapons.  That certainly has an impact on the younger

18   individuals in the community and the younger individuals in

19   the gang.  So not only is he directing them to kill people,

20   he's showing them how to do it with firearms, and then he's

21   actually soliciting them and using them to commit crimes.

22   When he and his cohorts went to Milwaukee to commit a

23   robbery, a smash and grab, one of individuals that went into

24   the jewelry store was a minor, he was a minor at the time.

25   I'm fairly certain that he was well aware of that.  He knew

 1    what he was doing.  It was by design -- other gang members
 2    had told us that it was by design that they picked younger
 3    individuals under the theory that they would get less of a
 4    punishment.  He was literally corrupting a community.
 5         I mentioned the firearms that the defendant had,
 6    but when you look at the pictures, for example, on page 32 of
 7    the government's sentencing memorandum, he's not just in
 8    possession -- I mean, it is multiple firearms in his pockets
 9    out in front of him.  These are acts of intimidation.  These
10    are -- this is a message that he's sending to the community
11    and to rival gangs that they are not to be messed with.  He's
12    essentially creating a culture of violence in his community.
13    In this gang, having a firearm is having power.  And he
14    wasn't just boasting about it, he wasn't just putting
15    pictures on social media.
16         In the summer of 2014, over the course of less than
17    three months, he was actually caught with three separate
18    firearms on three separate occasions.  That's staggering.  I
19    think June, July -- twice in July he was pulled over at three
20    separate times and had a gun on him each time.  The first
21    question that comes to mind is how many times does he have a
22    gun on him when he's not pulled over by the police?  I would
23    suggest that that's always.  The other thing that comes to
24    mind is the access to firearms that he has.  I mean, to be
25    able to lose a gun and then within a very short period of

1    time obtain another gun, illegally obviously, is quite scary.

2          Mr. Matthews has a total lack of respect for law

3    enforcement and a total lack of respect for the criminal

4    justice system.

5          In Facebook communications and off of his -- and in

6    social media communications, LOL, you know I still got

7    strap -- which is a firearm -- fuck the feds.

8          On Twitter, judge said I got -- and I believe he's

9    referring to you or just the federal system -- judge said I

10   gotta stay away from guns.  I'm thinking not, not a chance,

11   bum bum.

12          This is his mindset, and I don't believe for a

13   second that he's changed.  To spend 15 minutes in court and

14   apologize doesn't change his stripes.  And it is not as if he

15   just sat back and was an armchair leader directing people

16   what to do.  As I mentioned, he went to Milwaukee and

17   participated in that robbery.  He drove with his cohorts to

18   Kentucky and participated in that robbery.  And during the

19   course of the investigation we found a recording that I had

20   to listen to so many times to believe what I was actually

21   hearing I couldn't understand.

22          There's a recording where Mr. Matthews is on the

23   phone with another individual who was incarcerated with the

24   Michigan Department of Corrections.  That individual was

25   the -- was a codefendant's half brother.  And during the

1  conversation basically the individual in prison was speaking

2  with Mr. Matthews about Mr. Matthews becoming a heroin dealer

3  for him.  And while he's -- while Mr. Matthews is actually on

4  the phone with the person in MDOC, and this call is being

5  recorded, Mr. Matthews and a codefendant -- or a

6  coconspirator of his robbed another individual.  You could

7  hear them in the background sticking some lady up.

8           And when I heard the call, I questioned about

9  whether that was really going -- that was what was really

10 going on because there were portions that were muffled, but

11 then a few weeks later he actually speaks on another recorded

12 call to Gino Solomon, the half brother of the heroin dealer,

13 and he says oh, funny that you called, I spoke to this other

14 individual recently, and what's really funny is that me and

15 Wani (phonetic), the other gang member, stuck up a lady while

16 we were talking to him.

17          This is the mindset that he has.  Not only is he a

18 danger to the community, he's committing an armed robbery of

19 a citizen in the area while on a recorded phone call with a

20 Michigan Department of Corrections individual while trying to

21 set up heroin deal.

22          MR. MORRIS:  Judge, I would object to that.

23          THE COURT:  Well, you can object.  They have signs

24 up, you know, that these telephone calls are recorded.

25          MR. MORRIS:  But we don't -- I didn't listen to

1    these.  I'm not sure if these calls were even provided to us,

2    and this is certainly not something that's in the indictment,

3    it's not something that he plead guilty to.

4              THE COURT:  He's not charged with it in the

5    indictment but it's in --

6              MR. WIGOD:  They were all provided.  The transcript

7    is in the sentencing memorandum.

8              THE COURT:  Right.

9              MR. WIGOD:  The Court can interpret it however it

10   wishes.  That's my interpretation.  I think it's rather

11   clear.

12             Judge, let me end on this.  You labeled the

13   defendant a punk.  I respectfully disagree some.  He's more

14   than a punk, he's a killer.  He's a cold-stone killer, make

15   no mistake about it.

16             A lot of times at these sentences we focus on the

17   defendant, and it is appropriate and I understand why, but

18   what gets completely lost too many times are the victims.

19   And we've spoken about Mr. Matthews' age, we've spoken about

20   what he's going to do in the future.  He has a future, but

21   there is one person who doesn't have a future, that's

22   Marcus Cole.

23             Marcus Cole was executed, literally executed by the

24   defendant.  Defendant and his gang members were out hunting,

25   and that was a word used by one of the coconspirators, out

1    hunting for Marcus Cole.  They heard that Mr. Cole was in the

2    neighborhood walking with another individual.  Three of them

3    were driving around in a car, and Mr. Matthews had a rifle on

4    him.  They found Mr. Cole, they stopped, he got out of the

5    car, aimed the rifle at Mr. Cole, and as Mr. Cole ran away,

6    completely unarmed, and shot him seven times.  Mr. Cole,

7    unfortunately for him, ran into -- when he was fleeing

8    Mr. Matthews, he ran into a backyard that was completely

9    fenced, he had nowhere to go, and Mr. Matthews killed him,

10   then gets back in the car and tells his coconspirators we are

11   even, now we are even.  Mr. Cole will never have a future.

12   Mr. Cole was 16 years old.

13          And what did the defendant do after that?  He went

14   on and became a significant gang leader and he continued his

15   criminal activity.  He continued with the possession of a

16   firearm, he continued robbing people, he continued.  He

17   essentially bragged about this killing and it got him street

18   credit.

19          But the most important thing about that is that

20   Mr. Matthews -- there has to be retribution.  And I don't

21   think for one second that he's changed.  Over the course of

22   several years he's been violent and an entirely negative

23   impact on the community.  I think under the totality of the

24   circumstances, his continued criminal behavior and the

25   terrible acts he committed, a sentence of 35 years is

 1   appropriate.

 2          THE COURT:  All right.  It is the Court's

 3   obligation to impose a sentence that is sufficient but not

 4   greater than necessary to comply with the purposes of our

 5   law.  And I have to look at the sentencing guidelines, which

 6   we've discussed, and with the 3553(a) factors, which we will

 7   discuss.

 8          You know, as I read before in the government's

 9   sentencing memorandum, and as I read the indictment and all

10   the different things that happened here, my inclination is

11   simply to want to basically throw you in prison for the rest

12   of your life.  And as the Judge, what I have to do is look at

13   all of these particular factors and restrain the natural

14   instinct of anybody who would hear what the government just

15   laid out for you and want to punish you to the extreme.  I

16   have to look at something that I truly believe would be

17   sufficient but not greater than necessary.

18          We know certainly that the -- that the nature of

19   this charge -- charges, these are very, very extreme,

20   probably the most extreme charges that I have seen, and I've

21   done some gang work unfortunately here as we have done, but

22   what you have done and your gang and your entry to the gang

23   is truly extreme and it's evil.  And there are, it is

24   frequently said, two kinds of people: one that, you know, you

25   make a mistake, you are immature, et cetera, but you could be

1    rehabilitated; and then there are those people who are simply

2    evil, that they have no sense of right and wrong.

3            Now, you are telling me today that you, in fact,

4    have matured and that you are different now than you were

5    there.  And I really, really, really hope that's true, I hope

6    that's true.  You've got all of these people here who are

7    supporting you, and I would hope if anybody could make it

8    ultimately, you can.

9            But what concerns me is you had all of these people

10   supporting you and it didn't seem to make any difference.

11   And I understand what your father said and what you said,

12   that there was no male role model, and that's got to be very

13   difficult and something that maybe this Court cannot be as

14   sensitive to as others who have grown up in this environment,

15   but we can't let it be an excuse because you know what?  You

16   went around and you victimized your own people, you

17   victimized your own people.  So I don't see that excuse.  I

18   think you just simply were immoral.

19           The background that you have -- well, you don't

20   have much of a background.  I mean, your background is in the

21   criminal justice system from the time -- from the time that

22   you were 14, at least that I'm aware of, but if you were out

23   there shooting guns when you were -- in 2012, I would say

24   that you were doing a lot of things back then that were

25   criminal in nature.

```
 1              And the Court has to look at, you know, what
 2    sentence is sufficient, what sentence is sufficient?  What
 3    can we do when you are sentenced for you?  How can we do
 4    something to help you?  Can the prison system help you?  That
 5    might sound contradictory, but truthfully there are -- I
 6    mean, that is a purpose of sentencing is to get you into the
 7    programs, the educational level.  You are a smart kid.  You
 8    graduated from high school and you went on to college, I mean
 9    you took courses for a couple months anyway, you got in.  So
10    hopefully the prison will provide you with some further
11    education, further reading, et cetera.
12              But I think it is very important to protect the
13    public from you because you obviously -- you know, you say
14    now you have matured, and I hope that's true, but I don't
15    know that's true.  But what I do know is how dangerous you
16    were, how terribly dangerous you were.  The question is are
17    you now?  I don't know.  If I had to guess, I would come down
18    on the side of the prosecution and say, yeah, you are still
19    dangerous.  But I would hope in your time in prison you would
20    be able to overcome that so that when you do get out of
21    prison, you could be a productive member of society.
22              And also we need to provide an example to other
23    young men.  As you said, you know, you need to get to them
24    and you need to tell them what happens to you when you are a
25    young man and you put yourself above God, you put yourself
```

1   above other young men and you are the ruler and the leader.

2   What happens to you when you are the ruler and the leader?

3   You end up locked in a cell.  It gives you a lot of power.

4           So the Court considered all of these factors, and I

5   considered the guidelines and what your counsel asked for and

6   what the government asked for, and I'm going to commit you to

7   the Bureau of Prisons for a term which is going to be

8   equivalent to 25 years.  I will get down to the details.  And

9   why do I say 25 years instead of 35 years?  Because I can't

10  even imagine a young man like you looking ahead 25 years.  It

11  is like your whole life again.  And either you are

12  rehabilitated in your 25 years or you're going to come out

13  and you will just be killed or go to prison for the rest of

14  your life.

15          And there are victims here.  There are more than

16  this young man who was killed.  There are all of these other

17  people that you put in terror.  There's the people that you

18  committed -- you know, that you held up while you were on the

19  phone.  And I can't even imagine how many others, though I

20  think we can all believe that there were many people who were

21  terrorized by you.

22          But I do think that for the most of this, you were

23  very young and that just maybe, just maybe you would be one

24  of those people who can be rehabilitated and, with the

25  support of your family, lead a crime-free life.

1      So I think that an appropriate sentence is on

2   Count 1, 276 months; 36 months on Count 4 to be served

3   concurrently with Count 1; and 24 months consecutive to the

4   other counts.  We didn't talk about that but that's the

5   sentence enhancement that the government had because you

6   committed this crime while you were under indictment on

7   another charge.  That's for a total of 300 months, which is

8   25 years.

9      Upon release from imprisonment you will be placed

10  on supervised release for a term of five years on Count 1 and

11  three years on Count 4.

12     You will pay a special assessment of $100 per count

13  for a total of $200, which is due immediately.

14     The Court waives the imposition of a fine, cost of

15  incarceration and cost of supervision due to your lack of

16  financial resources and restitution obligation.

17     Restitution in the amount of $28,000 is ordered to

18  the victims of the offense.  Restitution shall be paid

19  jointly and severally with your co-defendants in this case

20  and interest will not accrue.

21     You will pay your $28,000 to the Clerk of the

22  Court.  $10,000 will go to Schwanke-Kasten Jewelers in

23  Milwaukee, and $18,000 to Jewelers Mutual in Wisconsin.  So I

24  think that's something that you are going to have to work

25  when you get out of prison because you are not going to make

1   that money in prison, you're going to have to make it when

2   you get out.

3           While in custody you will participate in the Inmate

4   Financial Responsibility Program.  The Court is aware of the

5   requirements of that program and approves the payment

6   schedule of the program and orders you to comply with it.

7           Mandatory drug testing is ordered.

8           While on supervision you will abide by the standard

9   conditions adopted by the United States District Court for

10  the Eastern District of Michigan, and you will comply with

11  the following special conditions:

12          You should be lawfully and gainfully employed, so

13  that means you are working 40 hours a week, and if you have a

14  part-time job, then you spend the rest of the 40 hours

15  seeking employment.

16          You will be in a program approved by probation for

17  mental health counseling if necessary.

18          And this goes without saying, you cannot be a

19  member of a gang, an association.  Do you understand that, of

20  any kind, whether you are in prison or out of prison?

21          THE DEFENDANT:  Yes, I understand.

22          THE COURT:  Okay.  And you shouldn't be in the

23  company of those that you believe wear or display in any

24  manner a sign that they shall be -- that they are in the

25  gang, and, of course, you should not wear anything associated

1    with a gang.  You shouldn't use hand signals, body signals,

2    anything else with a gang.

3          And I don't know what the state of the social

4    networking, we can only imagine what it will be in 25 years,

5    but, you know, you were so stupid you advertised everything

6    you did, so when you get out, you are not to use social media

7    while you are on supervised release.

8          You will provide the probation officer access to

9    any requested financial information, and you will make

10   monthly payments on which you owe in restitution and

11   assessments, and the Court will approve what is recommended

12   by probation.

13         And you should not incur any new credit charges or

14   open any additional lines of credit unless you are in

15   compliance with your payment schedule and approved by the

16   Probation Department.

17         Okay.  The Court accepts the Rule 11.

18         MR. WIGOD:  I'm sorry, Your Honor.  There was no

19   Rule 11.

20         THE COURT:  That's right, he pled on the nose.

21   Okay.

22         MR. WIGOD:  I just had a question as to the Court's

23   apportionment of the sentence.

24         THE COURT:  Do you want me to repeat that?

25         MR. WIGOD:  Yes.

1        THE COURT:  Let's make sure it adds up.  It is --

2        PROBATION OFFICER:  Your Honor, upon looking at

3   this further, I believe Count 1 would have to be the

4   240 months with the 20-year max, and then you could do the

5   36 months --

6        THE COURT:  I thought you told me differently.

7        PROBATION OFFICER:  Yes, I apologize.  I looked at

8   it again.

9        MR. WIGOD:  Your Honor, the enhancement only

10  applies to Count 4, not Count 1, so the statutory maximum on

11  Count 1 would be 240.

12       THE COURT:  Okay.  Is that what you're saying?

13       PROBATION OFFICER:  Yes, Judge.  Upon looking at it

14  further, I realized that the 240 months should be on Count 1,

15  and then on Count 4 you could do, to reach the 300 months,

16  36 months consecutive to Count 1 plus the 24 months

17  consecutive to the sentence on Count 4.

18       THE COURT:  Okay.  Let's make sure this adds up.  I

19  did the total because I wanted it to be 25 years and not 35,

20  so let's go back and just make sure.

21       It's 240 months on Count 1, 36 months on Count 4,

22  and 24 months -- the 36 months to be consecutive to --

23       MR. WIGOD:  All three sentences should be

24  consecutive to each other.

25       THE COURT:  Yes.  The 36 months will be consecutive

1     to Count 1, and then the 24 months will be consecutive to

2     Count 4, so that's a total of 300 months; is that right?

3                 PROBATION OFFICER:  Yes, Your Honor.

4                 THE COURT:  I'm sorry.  I did -- my math was wrong

5     and I'm glad you caught that.

6                 Okay.  Do you have any questions on that?  Do you

7     want me to go over that again?

8                 THE DEFENDANT:  No, it's 25.

9                 MR. MORRIS:  No, Your Honor.

10                THE COURT:  Okay.  Then we have -- oh, are there

11    any objections to the sentence as stated?

12                MR. WIGOD:  No, Your Honor.

13                THE COURT:  Defense?

14                MR. MORRIS:  No, Your Honor.  We have no questions.

15                THE COURT:  Okay.  Is there anything else, Counsel?

16                MR. WIGOD:  Not as it relates to this.

17                THE COURT:  I know we have another sentencing but

18    anything on this?

19                MR. MORRIS:  No, Your Honor.

20                THE COURT:  Okay.  You do have the right to appeal

21    this matter if you wish, and you must do so within 14 days of

22    today's date.  Okay.

23                Now, going to the other case, which is 15-30102,

24    possession of a firearm with the altered serial number.

25                I didn't receive any objections on that case.  Is

```
 1    there anything -- I'm sorry, we have to do new attorneys.
 2    I'm very sorry.  Okay.
 3                On this case let's do appearances again just to be
 4    sure the record is clear.
 5                MR. WIGOD:  Tare Wigod on behalf of the government.
 6                MR. GONEK:  Ben Gonek on behalf of Mr. Matthews for
 7    this case.
 8                THE COURT:  Okay.  And, Mr. Matthews, have you gone
 9    over this presentence report with your attorney, Mr. Gonek?
10                THE DEFENDANT:  What did you say?
11                THE COURT:  Have you gone over the presentence
12    report with Mr. Gonek?
13                THE DEFENDANT:  No, I haven't.
14                THE COURT:  Pardon me?  No?  Did you say no?
15                THE DEFENDANT:  I thought he was taking care of it,
16    Your Honor.  I didn't know -- I thought he was going to take
17    care of it.
18                MR. GONEK:  Do you want Mr. Morris to represent you
19    on this?
20                THE DEFENDANT:  Yeah, he can.  I thought that's
21    what was going on.
22                MR. GONEK:  Your Honor, I think there was --
23                THE DEFENDANT:  I thought he just took care of it.
24    I didn't know he was coming up.  So I don't know what's going
25    on basically.  I thought he just took care of everything.
```

```
 1              THE COURT:  Well, your attorney, Mr. Morris, filed
 2     in the one case only to represent you, and Mr. Gonek
 3     continues then to represent you in this case.
 4              Have you gone over this presentence report with
 5     him?
 6              MR. GONEK:  I have not.  I went down -- we sent the
 7     presentence report a while back, we came here for a
 8     sentencing a while back, and it was adjourned until today.
 9     There weren't any objections filed.  I think Mr. McManus
10     actually represented Mr. Matthews when this presentence
11     report was prepared because it was quite some time ago.
12     Because I was confused today procedurally how we would
13     proceed in light of the fact that Mr. Morris substituted in
14     on one case and not the other.
15              THE COURT:  Well, we are proceeding to sentencing.
16              MR. GONEK:  No, I understand that, Your Honor.  But
17     when I went -- I -- it was -- it has always been my
18     understanding that Mr. -- and correct me if I'm wrong, you
19     didn't want me as your lawyer, right?
20              THE DEFENDANT:  Correct.
21              MR. GONEK:  And that's why you retained counsel,
22     correct?
23              THE DEFENDANT:  Correct.
24              MR. GONEK:  And I think there was just a -- I don't
25     know --
```

| | |
|---|---|
| 1 | THE COURT:  So, Counsel, both of you, why didn't |
| 2 | you take care of this before?  This is not too confusing. |
| 3 | Mr. Morris, are you representing him on this case? |
| 4 | MR. MORRIS:  Judge, I didn't know of this case, the |
| 5 | pendency of this case.  I was focused on the big case, that's |
| 6 | all I was -- I didn't realize this other case was even |
| 7 | scheduled for today until he came into custody and wanted to |
| 8 | talk to him about it, so that perhaps is certainly my fault |
| 9 | but I didn't -- I wasn't even aware of it. |
| 10 | MR. GONEK:  Your Honor, if I could just give the |
| 11 | Court -- when I was contacted, it wasn't by Mr. Morris, it |
| 12 | was by his assistant to substitute in.  I made arrangements |
| 13 | to copy our files on the computer disk and I signed -- or |
| 14 | gave my consent to sign a stipulation for substitution.  I |
| 15 | did advise Mr. Morris' assistant that there was another case |
| 16 | and that there -- that -- and the assistant advised me they |
| 17 | wouldn't be representing Mr. Matthews in that case.  I should |
| 18 | have at that time contacted Mr. Morris and got some type of |
| 19 | joint plan together to make some sense out of this, and so I |
| 20 | am somewhat culpable as well. |
| 21 | THE COURT:  Let's take a short break and, Counsel, |
| 22 | both of you, if you would talk with the defendant, he can |
| 23 | stay up here. |
| 24 | Mr. Matthews, this presentence report is |
| 25 | basically -- correct me if I'm wrong, but as I read it, |

```
 1    except for the facts of case and the guidelines, it is

 2    exactly the same as the one that you went over with

 3    Mr. Morris.

 4              THE DEFENDANT:  All right.

 5              THE COURT:  So you can take a minute to just look

 6    at it, to look at the facts of the case, and the sentencing

 7    guidelines in this case are 18 to 24 months, most likely will

 8    be concurrent.  I don't see any sense in adjourning this and

 9    having everybody come back, so let's take a minute.

10              MR. GONEK:  If we could have five minutes?

11              THE COURT:  That would be fine.

12              THE CLERK:  All rise.  This Court is in recess.

13    Please be seated.

14              (Court recessed at 3:18 p.m.)

15                           _   _   _

16              (Court reconvened at 3:22 p.m.; Court, Counsel and

17              all parties present.)

18              THE COURT:  All right.  Continuing with the

19    sentence, Mr. Gonek.

20              MR. GONEK:  Yes, Your Honor.  Both Mr. Morris and I

21    spoke with Mr. Matthews.  He does want to proceed to

22    sentencing on the '14 case today, and he has no problem with

23    me representing him at this sentencing.  Is that correct?

24              THE DEFENDANT:  Yeah.

25              MR. GONEK:  Okay.
```

1          THE COURT:  Okay.  And, Mr. Matthews, you

2     understand that this -- you have reviewed the report, at

3     least you reviewed it with Mr. Morris, correct?

4          THE DEFENDANT:  Yeah.

5          THE COURT:  Okay.  I'm looking at that other

6     report.  Just one minute.  Okay.  So before the Court passes

7     sentence, is there anything else that you wish to say?

8          MR. GONEK:  I just would like to make one brief

9     point that I think speaks to Mr. Matthews' maturity.  In this

10    case, the 2014 case, the gun that was found was found in a

11    trunk, it wasn't found on his person, I believe, or, you

12    know, in close proximity.  He fully cooperated with the law

13    enforcement officer that pulled him over or stopped him and

14    arrested him, and he did accept responsibility by pleading

15    guilty straight up to this offense with the understanding

16    that he could go to prison.  He accepted responsibility for

17    this wrong, Your Honor, and I think that that was a, you

18    know, I believe the first start of a turning point that's

19    going to continue in Mr. Matthews' life.

20          And in light of the sentence on the other case,

21    Your Honor, I would ask the Court to consider just -- I

22    understand what the guidelines are, 18 to 24 months, but just

23    imposing a sentence of a day and closing this case out in

24    light of the sentence in the other case that he was just --

25    that he just received.  Thank you.

```
 1              (An off-the-record discussion between
 2              Defense Counsel and Defendant was held at
 3              3:25 p.m.)
 4         MR. GONEK:  I may have used a poor choice of words
 5    when I indicated that when Mr. Matthews was arrested he
 6    cooperated.  He didn't cooperate in terms of giving
 7    information.  He just did what the officer asked in terms of
 8    being arrested.  He didn't flee, he didn't hit the officer.
 9    He just did what he was told at the time of his arrest.  If I
10    used the words cooperated, by no means has Mr. Matthews ever
11    cooperated with the government in providing any type of
12    information.
13         THE COURT:  Okay.  Mr. Matthews, do you have
14    anything else that you wish to say?
15         THE DEFENDANT:  No, Your Honor.  Thank you.
16         THE COURT:  Okay.  Government?
17         MR. WIGOD:  I would just ask for a guideline
18    sentence, Your Honor.
19         THE COURT:  Okay.  Well, wait a minute because you
20    submitted a presentence report, the guidelines are 18 to 24,
21    which you acknowledge, but you are requesting 15 months?  No,
22    is this not the case?
23         MR. WIGOD:  The guidelines are 18 to 24, Your
24    Honor.
25         THE COURT:  I'm sorry.  Okay.  I'm sorry.
```

1          The Court is going to impose a guideline sentence
2    in this case and commit you to the Bureau of Prisons for
3    18 months, but I'm going to do it concurrent to your sentence
4    that I just imposed in the other case.   Okay.
5          And, again, on this case you have the right to
6    appeal, but if you do so, you would have to do so within
7    14 days of today's date.   Okay.
8          Anything else the government?
9          MR. WIGOD:   No, Your Honor.   Thank you.
10          THE COURT:   Defense?
11          MR. GONEK:   No, Your Honor.
12          MR. WIGOD:   I believe there is a special
13    assessment, Your Honor.
14          THE COURT:   Oh, I'm going too fast.   There is a
15    $100 special assessment on this case also, and there will be
16    a period of supervised release of two years which would run
17    concurrent with the supervised release on your other case,
18    and the same conditions apply as I imposed on the other one
19    regarding you cannot associated with gang members, you can't
20    be in a gang.   Okay.   Anything else?
21          PROBATION OFFICER:   Your Honor, the Court may wish
22    to waive the fine, cost of incarceration and cost of
23    supervision in this case as well.
24          THE COURT:   Yes.   I will waive the cost of
25    supervision and the fine.   Okay.

Sentence - September 21, 2017

1         MR. MORRIS:  Thank you, Your Honor.

2         MR. WIGOD:  Thank you, Your Honor.

3         (Proceedings concluded at 3:28 p.m.)

4                     —    —    —

```
 1

 2                            CERTIFICATION

 3

 4            I, Robert L. Smith, Official Court Reporter of

 5    the United States District Court, Eastern District of

 6    Michigan, do hereby certify that the foregoing pages comprise

 7    a full, true and correct transcript taken in the matter of

 8    UNITED STATES OF AMERICA vs. DEONTA MATTHEWS, Case No.

 9    14-20655 & 15-20201, on Thursday, September 21, 2017.

10

11                                  s/Robert L. Smith
                                    Robert L. Smith, CSR 5098
12                                  Federal Official Court Reporter
                                    United States District Court
13                                  Eastern District of Michigan

14

15

16    Date:  06/08/2018

17    Detroit, Michigan

18

19

20

21

22

23

24

25
```